IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) NO. 3:15-cr-00139 |
| v. | ) |
| | ) JUDGE RICHARDSON |
| | ) |
| ANTHONY ALLEN | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are *pro se* letters filed by Defendant that the Court construes collectively as a motion to modify sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). (Doc. Nos. 79, 80, "Motion").[1] Via the Motion, Defendant seeks a reduction of his 262-month sentence and immediate release from the custody of the Bureau of Prisons ("BOP") "to prevent the contraction of COVID-19." (Doc. No. 79 at 1). Like many other federal inmates in this district and around the country, Defendant claims that the ongoing COVID-19 pandemic, as applied to his specific health profile, render him eligible for release from BOP custody. The Government has filed a response in opposition, (Doc. No. 82, "Response"), arguing that Defendant has not shown as required "extraordinary and compelling reasons" for compassionate release or that he is not a danger to the safety of other persons, and that other applicable considerations counsel strongly against compassionate release.

---

[1] Such motions are also known as ones for "compassionate release"; thus, the Court refers to both "compassionate release" and "sentence modification" throughout this opinion when referring to Defendant's requested relief. *See United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at n.2 (D. Utah Feb. 18, 2020) ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020).

## PROCEDURAL BACKGROUND

On July 31, 2015, at approximately 4:30 a.m., agents with the Federal Bureau of Investigation's ("FBI") SWAT Team, with the assistance of officers with the Metropolitan Nashville Police Department's ("MNPD") SWAT Team, executed a federal search warrant at a residence located in Nashville to search for evidence of drug-trafficking activity, illegal possession of firearms, and possession of firearms in the furtherance of drug-trafficking crimes. (Doc. No. 71 at ¶ 8).[2] FBI SWAT agents approached the front of the residence, knocked on the front door, and repeatedly announced their presence. (*Id.*). The SWAT agents then observed Defendant open the front door, point a pistol with an extended magazine through the doorway, fire the pistol in the immediate direction of several SWAT agents, and then close the front door. (*Id.*). Approximately ten minutes later, Defendant exited the residence and was taken into custody. (*Id.*).

During a search of the residence, two firearms were located inside the residence, including a Glock 9mm pistol with an extended magazine consistent with the one SWAT agents observed and surveillance video showed Defendant firing out the door. (*Id.*). A 9mm shell casing was recovered on the ground just outside the door; this was the spent shell casing from the 9mm round the defendant had fired out the front door. (*Id.*). Defendant was a convicted felon at the time, with 2012 convictions for Aggravated Burglary and Burglary-Auto from Shelby County, Tennessee, and 2013 conviction for Aggravated Burglary, also from Shelby County, Tennessee. (*Id.*). At the time of this shooting, Defendant was actively distributing heroin from the residence, which belonged to his brother. (*Id.*).

That same day (July 31, 2015), Defendant was arrested on a criminal complaint in connection with the incident. (Doc. Nos. 3, 4). On August 5, 2015, a federal grand jury indicted

---

[2] These facts are drawn from the factual basis (to which Defendant admitted) contained within Defendant's plea agreement. (Doc. No. 71).

Defendant for the following offenses: Assault of Federal Officers, in violation of 18 U.S.C. § 111(a) and (b) (Count One); Using, Carrying, Brandishing, and Discharging a Firearm During a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count Three); and Possession of Ammunition by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924 (Count Four). (Doc. No. 16). On August 30, 2017, Defendant pled guilty to all counts of the Indictment, pursuant to a written plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) that contained a joint recommendation for a sentence of 262 months' imprisonment and five years of supervised release. (Doc. No. 71). On December 19, 2017, the Court imposed the jointly recommended sentence. (Doc. No. 76).

LEGAL STANDARDS FOR "COMPASSIONATE RELEASE"

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act of 2018, P.L. 115-391, 132 Stat. 5239,[3] the district court may under certain circumstances grant a defendant's motion for compassionate release if what the Court will call the "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all administrative rights to appeal a failure of [BOP] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier."

---

[3] That paragraph of Section 603 provides:

 (b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE.—Section 3582 of title 18, United States Code, is amended—
    (1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . .''

Once it properly can act on a motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court can reduce a sentence under that provision (for any defendant younger than 70 years old)[4] only if it finds extraordinary and compelling reasons to do so. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of showing that "extraordinary and compelling reasons" exist to justify release under the statute. *United States v. Hayward*, No. CR 17-20515, 2020 WL 3265358, at *1 (E.D. Mich. June 17, 2020). And the Court does not write on a clean slate in considering what qualifies as "extraordinary and compelling reasons."

Congress tasked the Sentencing Commission with promulgating "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [section] 3582(c) of title 18. . . ." 28 U.S.C. § 994(a)(2)(C). Congress directed the Sentencing Commission, in promulgating these policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response to these congressional instructions, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, and its application note, which collectively comprise the policy statement(s).

Practitioners of federal criminal law are accustomed to treating the Sentencing Commission's policy statements as advisory only (especially in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005)). They are exactly that in the context of a defendant's original sentencing—but not in the context of a motion under Section 3582(c)(1)(A). In the latter context, they are by statute mandatory, inasmuch as Congress has prohibited courts from granting a sentencing reduction unless "such a reduction is consistent with applicable policy statements

---

[4] This subparagraph provides an alternative ground for relief for defendants who are at least 70 years of age. *See* 18 U.S.C. § 3582(c)(1)(A). It is inapplicable here, however, because Defendant is only 39.

issued by" the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).[5]

Together, U.S.S.G. § 1B1.13 and its application note do two things that are relevant here. First, they define, in Application Note 1, "extraordinary and compelling circumstances" to apply in (and only in) situations falling within one or more of five separate and particular categories, which the Court discusses below. *See* U.S.S.G. § 1B1.13 n.1(A)(i)-(ii), (B), (C) & (D).[6] Second, they prescribe additional requirements for obtaining a sentence reduction where the defendant does meet the threshold requirement of "extraordinary and compelling circumstances."[7] Specifically, for a defendant not yet 70 years old (such as Defendant), the court may reduce a sentence if (1) extraordinary and compelling reasons warrant a reduction, *and* (2) the defendant is not a danger to the safety of any other person or to the community, *and* (3) the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) and (3). The Application Note indicates the third requirement may be redundant of the first two, inasmuch as it states that "any reduction made . . . for the reasons set forth in subdivisions (1) and (2) [*i.e.*, U.S.S.G. § 1B1.13(1) & (2)] is consistent with this policy statement." *Id.* at n.5.[8]

---

[5] In *Booker*, the Supreme Court found unconstitutional (*i.e.*, violative of the Sixth Amendment) Congress's directive that the Sentencing Guidelines are generally what was referred to as "mandatory," meaning that sentence generally had to be imposed within the guideline range calculated using the Sentencing Guidelines. To say the least, this limited Congress's ability to make anything about the Sentencing Guidelines mandatory in the context of an original sentencing. But such limitations do not exists in the context of a motion for sentence reduction under Section 3582(c)(1)(A), wherein the Sixth Amendment concerns driving the *Booker* decision are entirely absent.

[6] The Application Note also contains various other instructions for considering whether extraordinary and compelling circumstances exist. Such instructions need not be discussed here, as the Court herein resolves the Motion without any need to refer to them.

[7] It is important to note that these other requirements—being, after all, *requirements*—are mandatory. That is to say, a defendant is *not* eligible for compassionate release merely because there are "extraordinary and compelling reasons" within the meaning of Application Note 1(A).

[8] Like many redundancies, this one may seem odd due to its apparent unnecessariness. But it seems motivated by the valid desire to ensure that the Sentencing Commission's criteria for a sentencing reduction expressly both: (a) included the congressional requirement, discussed below, that any reduction be "consistent with applicable policy statements issued by" the Sentencing Commission; and (b) clarified that the required consistency involved nothing more than satisfaction of U.S.S.G. § 1B1.13(1) & (2).

If the court does find these (two or three depending on how one looks at it) requirements satisfied, the defendant has met the basic eligibility for compassionate release. But even then, the Court does not automatically or necessarily grant the motion for a reduction; instead, it *may*, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce the term of imprisonment (and may impose a term of probation or supervised release that does not exceed the unserved portion of the original term of imprisonment). *See* 18 U.S.C. § 3582(c)(1)(A).

The (familiar) sentencing factors set forth in Section 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .
> i) [United States Sentencing Guidelines, ("U.S.S.G.")]—
> ii) [in effect at the time of sentencing]
>
> (5) any pertinent policy statement—
> A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code; and
> B) [and in effect at the time of sentencing]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Relevant to factor number (5), as discussed above, the Sentencing Commission has issued a binding policy statement regarding reduction of a term of imprisonment under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. As further mentioned above, Application Note 1 to U.S.S.G. § 1B1.13 speaks to what constitutes "extraordinary and compelling reasons," identifying five categories of situations where such reasons may be found to exist. Two of the five involve the defendant's medical condition, *i.e.*: (i) the defendant is suffering from a terminal illness; or (ii) the defendant is suffering from a serious physical or medical condition, or serious functional or cognitive impairment, or deteriorating physical or mental health due to the ageing process, that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. *See* U.S.S.G. § 1B1.13 n.1(A). The next two categories relate to defendants over 65 and defendants with particular grave family circumstances, respectively; they are not applicable to the instant Motion.

As for the last of the five categories (sometimes referred to as the "residual" or "catchall" provision), the Application Note describes it as encompassing the situation where, "*[a]s determined by the Director of the Bureau of Prisons*, there exists in the defendant's case an extraordinary and compelling reason *other* than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1(D) (emphasis added).

THE PARTIES' RESPECTIVE POSITIONS

In the Motion, Defendant relies on the prevailing COVID-19 pandemic and his medical conditions, *i.e.*, high blood pressure and blood clots in his left lung from which he suffers as a result of a stabbing that occurred while in BOP custody. As Defendant describes it, he "is asking for emergency release from USP Lewisburg [(where he is currently incarcerated)] to prevent the contraction of the COVID-19." (Doc. No. 79 at 1). Defendant contends that his "lungs won't be

able to fight off the coronavirus if contracted" and there is little opportunity to practice social distancing at USP Lewisburg, which had forty-five cases at the time he sent his letter to the Court. (Doc. No. 80 at 1).

The Government argues in response that Defendant has not shown "extraordinary and compelling reasons" as required for compassionate release. (Doc. No. 82 at 6-12). The Government also correctly notes that under U.S.S.G. § 1B1.13(2), "the Court must deny a sentence reduction unless it determines the defendant 'is not a danger to the safety of any other person or to the community.'" (*Id.* at 12 (quoting U.S.S.G. § 1B1.13(2))). In the Government's view, this determination cannot be made as to Defendant. (*Id.* at 12-13). The Government further suggests that even if such determination could be made, the Motion should be denied because the factors under Section 3553(a) militate against granting the Motion. (*Id.* at 13-14).

## ANALYSIS

### I. EXTRAORDINARY AND COMPELLING REASONS

In addressing the merits, the Court first must determine whether "extraordinary and compelling reasons" exist for Defendant's compassionate release under the standards set forth by U.S.S.G. § 1B1.13 and its application note. Defendant bears the burden to show that extraordinary and compelling reasons exist warranting his release. *United States v. Shabudin*, No. 11-CR-00664-JSW-1, --- F. Supp. 3d ----, 2020 WL 2464751, at *3 (N.D. Cal. May 12, 2020); *United States v. Crouch*, No. 5:19-CR-00029-TBR, 2020 WL 1963781, at *3 (W.D. Ky. Apr. 23, 2020) ("[Defendant's] circumstances do not meet the burden of extraordinary and compelling.").

As noted, in the instant case, Defendant relies upon the above-referenced medical conditions (blood clots in his left lung and hypertension), combined with the COVID-19 pandemic. The Government argues that Defendant "has not established the severity of his current health

condition[s] or that he is not receiving all appropriate medical care at his BOP institution." (Doc. No. 82 at 11). In regards to Defendant's diagnosis of high blood pressure (also known as hypertension), the Government asserts that the Centers for Disease Control and Prevention ("CDC") recognizes that "regular" hypertension or high blood pressure poses only "a *possible* increased risk of severe illness from COVID-19," while recognizing that a diagnosis of pulmonary hypertension[9] does place one at an elevated risk of serious illness from contracting COVID-19. (*Id*. at 9 (citing *Coronavirus Disease 2019*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#serious-heart-condition)). The Government points out that Defendant's medical records do not indicate that he suffers from "pulmonary hypertension or any other sort of severe, debilitating, or life-threatening form of high blood pressure, only the common form identified as essential or primary hypertension." (Doc. No. 82 at 10). Further, the Government asserts that Defendant's medical records reveal that his blood pressure is appropriately managed with medication in the BOP facility. (*Id*.). Thus, the Government argues that Defendant has failed to show that his high blood pressure qualifies as "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." (*Id*.). Additionally, the Government contends that "there is similarly no indication from his records that . . . the injuries he sustained from a prison stabbing last year and the clots or embolism he reportedly suffered as a result . . . qualifies as a 'serious physical or medical condition.'" (*Id*. at 11).

---

[9] The Government explains that pulmonary hypertension is "'a type of high blood pressure that affects the arteries in your lungs and the right side of your heart.'" (Doc. No. 82 at 9 (quoting https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697)).

This Court has previously held that a diagnosis of high blood pressure (or as referred to in that case, hypertension), without more, does not constitute extraordinary and compelling reasons for release. *See United States v. Johnson*, No. 3:16-CR-00242, 2020 WL 4753846, at *5 (M.D. Tenn. Aug. 17, 2020) ("Although the Court credits that hypertension 'might' place a person at elevated risk of severe illness from COVID-19, the Court concludes that Defendant's hypertension does not constitute extraordinary and compelling reasons for his release."); *see also United States v. Cox*, No. 13-CR-20779-02, 2020 WL 4581692, at *1 (E.D. Mich. Aug. 10, 2020) (explaining that a diagnosis of hypertension does not constitute extraordinary and compelling reasons and noting that "hypertension is a common medical condition shared by over 100 million Americans"); *United States v. Hall*, No. CR JKB-04-323, 2020 WL 4582712, at *2 (D. Md. Aug. 10, 2020) (explaining that the defendant's hypertension diagnosis does "not sufficiently differentiate him form the thousands of similarly situated incarcerated individuals to constitute extraordinary and compelling reasons"); *United States v. Chambers*, No. 18-47 2020 WL 4260445, at *4 (E.D. La. July 24, 2020) (denying motion for compassionate release for 51-year-old male defendant with hypertension and other alleged medical conditions, explaining that "courts have found that hypertension does not amount to an extraordinary or compelling reason for release" during the COVID-19 pandemic) (collecting cases); *United States v. Jordan*, No. 09-CR-20490, 2020 WL 4016087, at *2 (E.D. Mich. July 16, 2020) (noting that "the CDC believes that hypertension 'might be' a COVID-19 risk factor, but this determination is still uncertain").

Here, Defendant's diagnosis of high blood pressure, which Defendant's medical records do not indicate is a specific, or otherwise serious form of high blood pressure, does not constitute an extraordinary and compelling reason for compassionate release. This is especially true because Defendant does not allege that the BOP facility in which he is incarcerated is not adequately

managing his condition, and Defendant's medical records indicate that his condition is in fact being managed with medication while he is incarcerated. (Doc. No. 82-2 at 6).

Defendant's past injuries to his left lung and resulting complications, however, is a somewhat different story. As is often the case when a defendant's medical conditions are raised on a compassionate release motions, evaluating whether Defendant's past blood clots that occurred in his left lung places Defendant at a higher risk of an adverse outcome if he were to contract COVID-19 places the Court in the difficult position of making medical assessments it is simply not qualified to make. The Court would be speculating to conclude that Defendant's prior lung injuries, and the complications that occurred after, would place Defendant at a higher risk if he were to contract COVID-19. However, it is certainly plausible that someone with weakened lungs (such as, presumably, Defendant) may be at a higher risk of complications if he or she were to contract COVID-19. *See What Coronavirus Does to the Lungs*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/what-coronavirus-does-to-the-lungs#:~:text=Acute%20Respiratory%20Distress%20Syndrome%20(ARDS,a%20form%20of%20lung%20failure (last accessed September 15, 2020). The Court need not make this determination, because, even assuming *arguendo* that Defendant has established extraordinary and compelling reasons based on weakened lungs, the Court finds below that compassionate release is not warranted in this case due to Defendant being a danger to other persons and the community if he were released; and because the Section 3553 factors weigh against his release.

II. DANGER TO THE SAFETY OF ANY OTHER PERSON OR THE COMMUNITY

As noted above, Defendant can be eligible for compassionate release, such that the Court proceeds to an analysis of the factors under 18 U.S.C. § 3553(a), only if he is not a danger to other persons or the community. *See* U.S.S.G. § 1B1.13. The Court generally perceives the precise issue

to be whether Defendant would pose such a danger if released (and not whether he currently poses a danger while incarcerated). "[T]he defendant has the burden of proof on the issue of his lack of danger to others and the community." *See United States v. Rodriguez*, No. 3:95CR772, 2020 WL 3260711, at *1 (N.D. Ohio June 13, 2020).

Defendant puts forth no argument that he would not be a danger to the community if he were to be released. The Court recognizes that Defendant is *pro se*; thus, his pleadings will be construed liberally. Nevertheless, even construing Defendant's filings liberally, the Court can concoct no potential argument that would negate the Court's conclusion that he would be a danger to the safety of other persons or the community if he were released, in consideration of Defendant's conduct surrounding the charges on which he is currently incarceration, his criminal history, and his BOP disciplinary record.

As described above, during the execution of a search warrant, Defendant fired a pistol in the immediate direction of several federal law enforcement officers. (PSR at ¶ 8). This action that lead to Defendant's current charges of incarceration is undoubtedly extremely dangerous. *See United States v. Riggins*, No. CR 20-10 (CKK), 2020 WL 1984263, at *4 (D.D.C. Apr. 27, 2020) (finding that the danger the defendant posed to the community prevented compassionate release where "[t]he offense [was] directly related to possession of a firearm, a dangerous weapon that could cause harm not only to law enforcement officers but also to bystanders. And, . . . [the defendant] fled from officers, retrieved the firearm from his belt, and would not drop the firearm when asked."). Defendant's act of firing a weapon toward law enforcement weighs heavily in the Court's conclusion that Defendant would pose a danger to the community if he were released. Further, due to his prior felony, Defendant was prohibited from possessing firearms, yet did anyway, evidencing his recidivism. *See United States v. Reed*, No. RDB-07-0470, 2020 WL

4732127, at *2 (D. Md. Aug. 14, 2020) ("[P]ossession of a firearm by a prohibited person, is in itself a serious crime and is indicative of [Defendant's] recidivism."). Perhaps even more to the point, he thereby indicated an unwillingness to abide by the rules applicable to those who have committed crimes; this raises grave doubts as to whether he would follow the conditions of release were he released in this case. Moreover, in his plea agreement Defendant admitted to dealing heroin out of the residence in which firearms were found. The confluence of drugs and firearms is a dangerous combination that further supports that Defendant would be a danger to the community if released. *See United States v. Poindexter*, No. 7:12-CR-12, 2020 WL 3473655, at *3 (W.D. Va. June 25, 2020) ("Poindexter's history of drug distribution and possession of firearms demonstrates that he is a danger to the community.").

Additionally, Defendant's criminal history, and his current disciplinary record while incarcerated, further supports the Court's finding that Defendant would pose a danger to others if released. Despite having just turned twenty-three at the time he was arrested for his current offense of incarceration, Defendant already had a significant criminal history, starting from the time he was eighteen years old (even though he spent over one year of that time in incarceration), including convictions for each of two aggravated burglaries, one committed while he was still on probation for the other. (Presentence Report ("PSR") at ¶¶ 27-32). Thus, Defendant's criminal record reflects a pattern of dangerous conduct (increasing in dangerousness in a short amount of time) even prior to his current charges of incarceration.

And there is no indication in the record that Defendant has put aside this pattern of behavior. Indeed, his BOP disciplinary record reveals five disciplinary infractions, two of which occurred just five months ago—one being of a serious nature, *i.e.*, injecting or utilizing an illicit substance. (Doc. No. 82-2).

Thus, in light of Defendant's history of dangerous behavior and possession of firearms, and his repeated willingness to engage in criminal conduct, Defendant has not shown that he would not be a danger to the community if he were released.[10] For these reasons, the Court finds that the danger Defendant would pose to others and the community if he were released prevents this Court from granting him compassionate release.

IV. SECTION 3553(a) FACTORS

Although Defendant does not qualify for compassionate release, irrespective of how the Section 3553(a) factors apply to him, the Court will discuss the most salient Section 3553(a) factors, which collectively cut against granting compassionate release for him.

*The nature and circumstances of the offense* cut against compassionate release. As discussed in detail above, the circumstances surrounding the instant offenses involve Defendant's attempt to shoot federal law enforcement officers. It goes without saying that this conduct is extremely serious in nature.

T*he history and characteristics of the Defendant* also cut against compassionate release. As discussed above, Defendant's criminal history and recent BOP disciplinary infractions reflect a pattern of conduct that exhibits dangerousness and an inability or disinclination to follow rules, which weigh against his release. Additionally, for the reasons discussed above in connection with whether Defendant would be a danger if released, *the need to protect the public from further crimes of the defendant* also cuts against releasing Defendant.

*The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* likewise does not cut in favor

---

[10] Defendant does not propose a release plan, but the Court finds that ordering Defendant to remain on home confinement would not dispel the danger Defendant poses to other persons and the community, based on Defendant's failure to follow court order and BOP rules.

of compassionate release for Defendant. Defendant does not indicate, nor do his medical records reveal, that his medical conditions are not adequately managed while in BOP custody. Moreover, the Court would merely be speculating to conclude that under Defendant's particular circumstances, his risk of infection would be substantially decreased were he released. It is not like there in no substantial risk of infection outside of BOP custody. For example, the Tennessee Department of Health reports, in Tennessee, 174,274 "confirmed or probable" and 17,466 "active" cases of COVID-19 as of September 14, 2020. *See Epidemiology and Surveillance Data*, Tennessee Dept. of Health, https://www.tn.gov/content/tn/health/cedep/ncov/data.html (last accessed September 14, 2020). And as is also a matter of public record (and undeniable truth in the undersigned's personal experience), these cases have accrued despite substantial steps to keep the infection rate down in Tennessee. To be sure, incarceration reportedly is statistically associated with a much higher risk of contracting COVID-19. But it would be mere conjecture to say how much better Defendants' odds of avoiding COVID-19 would be if he were released

      This is in part because the Court cannot have confidence that Defendant would adopt a lifestyle conducive to decreasing the risk of COVID-19 infection. Given Defendant's entire history, Defendant has demonstrated to some extent an unwillingness and/or inability to comply with rules and societal norms in at least some important respects. This is vital, because under his own theory (and the widely-accepted view worldwide), decreasing his risk of infection upon release from BOP custody would require him to observe public/health and societal norms related to COVID-19, such as handwashing, mask-wearing and social distancing.

      It likewise would be speculative to say that Defendant could expect a better outcome if infected outside, rather than in, BOP custody. Among other things, the Court has no basis to conclude that if released, Defendant would have access to medical care superior to the medical care he would receive in BOP custody.

For all of these reasons, there is no good basis to believe that Defendant's release is likely *in actuality*—not just theory—to substantially reduce his risk from COVID-19.

Moreover, the requested relief would undermine the need to "*promote respect for the law*," "*afford adequate deterrence to criminal conduct*," and "*avoid unwarranted sentence disparities.*" 18 U.S.C. § 3553(a)(2)(A), (B). It likewise would not square very well with his advisory *guideline range*, which under Section 3553(a) also must take into account. 18 U.S.C. § 3553(a)(4)(A). Defendant has only served about 23% of his 262-month sentence.[11] To release Defendant today would reflect a dramatic downward variance from Defendant's guideline range at sentencing (which was 241-271 months). (PSR at 19); *see United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (explaining that "the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."). Accordingly, to grant Defendant compassionate release would create an unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. Additionally, the requested reduced sentence would also fail to reflect the seriousness of the offense Defendant committed and would not provide just punishment for his conduct. It would also undermine the Court's efforts to use the sentence to promote respect for the law and serve as a deterrent for criminal conduct.

Thus, the Court finds that the Section 3553(a) factors do not weigh in favor of granting Defendant compassionate release, even if he were not a danger to the community.

---

[11] According to BOP's online searchable "inmate locator," Defendant's sentence is set to expire on May 28, 2034. *See Inmate Locator*, Bureau of Prisons, https://www.bop.gov/inmateloc (last accessed September 14, 2020).

CONCLUSION

Compassionate release is an extraordinary remedy. *See*, *e.g.*, *United States v. Rizzo*, No. CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Such remedy is unavailable here, given that if released, Defendant has not shown that he would not present a danger to other persons or the community. Alternatively, even if compassionate release were potentially available, it would be inappropriate, considering the Section 3553(a) factors.

For these reasons, Defendant's request for emergency release (Doc. Nos. 79, 80) is **DENIED**.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE